## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| CHRISTIAN DAVIS, | |
| Plaintiff, | |
| v. | Case No.: 1:23-CV-04800-JPB |
| BAYER CORPORATION A/K/A BAYER USA, | |
| BAYER U.S. LLC, | **JURY TRIAL DEMANDED** |
| BAYER CROPSCIENCE LP, | |
| and | |
| MONSANTO COMPANY, | |
| Defendants. | |

## FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW the undersigned Plaintiff, CHRISTIAN DAVIS, ("DAVIS"), by counsel, and requests that this court enter judgment against the Defendants, BAYER CORPORATION A/K/A BAYER USA, BAYER U.S. LLC, BAYER CROPSCIENCE LP, and MONSANTO COMPANY jointly and severally, and as grounds for such states as follows:

## INTRODUCTION

1.    This is an action for damages suffered by DAVIS as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising,

distribution, labeling, and/or sale of the herbicide Roundup, containing the ingredient glyphosate, diquat and POEA.

2. In 1970, Defendant Monsanto Company ("Monsanto") discovered the herbicidal properties of glyphosate, diquat and POEA, and began marketing it in products in 1974 under the brand name Roundup.  Roundup is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.  By 2001, glyphosate had become the most-used active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds by 2007. As of 2013, glyphosate was the world's most widely used herbicide.

3. Monsanto was a multinational agricultural biotechnology corporation based in St. Louis, Missouri. It was the world's leading producer of glyphosate, diquat and POEA. As of 2009, Monsanto was the world's leading producer of seeds, accounting for 27% of the world seed market. The majority of the seeds were of the Roundup Ready brand.  The stated advantage of Roundup Ready crops is that they substantially improve a farmer's ability to control weeds, since glyphosate, diquat and POEA can be sprayed in the fields during the growing season without harming crops. In 2010, an estimated 70% of corn and cotton and 90% of soybean fields in the United States were Roundup Ready.

4. In 1986, the Environmental Protection Agency ("EPA") requested that a pathology working group be convened to evaluate tumors found in the kidneys of male mice treated with glyphosate.

5. On March 20, 2015, the International Agency for Research on Cancer ("IARC"), an agency of the World Health Organization ("WHO"), issued an evaluation of several

herbicides, including glyphosate, diquat and POEA. That evaluation was based, in part, upon studies of exposure to glyphosate, diquat and POEA in several countries around the world, and traces the health implications from exposure to glyphosate, diquat and POEA since 2001.

6.    On July 29, 2015, IARC issued the formal monograph relating to glyphosate. In that monograph, the IARC Working Group provides a thorough review of the numerous studies and data relating to glyphosate exposure in humans.

7.    Past studies have identified the kidney as a susceptible organ to glyphosate, diquat and POEA. Previous studies have associated glyphosate, diquat and POEA exposure with changes in renal function, kidney injury, and chronic kidney disease of unknown etiology (Mesnage et al 2015; Jayasumana et al., 2015a; Jayasumana et al., 2015b; Zhang et al., 2017). There is growing evidence linking glyphosate exposure with the epidemic of chronic kidney disease of unknown origin in farm workers in Central America, Sri Lanka and central India (Valcke et al., 2017).

8.    DAVIS maintains that Roundup and/or glyphosate is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

9.    DAVIS's injuries, like those of thousands of similarly situated victims across the globe, were avoidable.

10.    At all times herein, the Defendants knew, or reasonably should have known, about the serious health risks Roundup posed to its users.

## THE PARTIES

11.    DAVIS is a resident of the Commonwealth of Virginia.  His home address is 3505 Tupelo Trail, Apt. 102, Virginia Beach, VA 23452.   At the time of exposure to Roundup causing his injuries, DAVIS was a resident of Augusta, Georgia.

12.    BAYER CORPORATION A/K/A BAYER USA ("BAYER CORP.") is a stock corporation incorporated in Indiana, USA.  BAYER CORP. has its principal place of business in Whippany, New Jersey.  The registered agent for BAYER CORP in Georgia is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092, USA.  BAYER CORP. is a wholly owned subsidiary of Bayer AG, an international enterprise.  BAYER CORP. runs national operations for Bayer AG and has approximately 40 consolidated subsidiary companies within the United States.

13.    BAYER CROPSCIENCE LP ("Bayer CS") is a limited partnership formed under Delaware law.  The registered agent for BAYER CS in Georgia is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092, USA.  BAYER CS is a subsidiary of Bayer AG.  BAYER CS designs and manufactures products in crop protection, pest control, seeds, and plant biotechnology.

14.    BAYER U.S. LLC ("BAYER U.S.") is a limited liability company formed under Delaware law.  Bayer U.S. has its principal place of business in Whippany, New Jersey.  The registered agent for BAYER U.S. in Georgia is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092, USA.

15.    MONSANTO COMPANY ("MONSANTO") is a stock corporation incorporated in Delaware.  MONSANTO has many principal places around the world, including St. Louis, Missouri.  The registered agent for MONSANTO in Georgia is Corporation

Service Company, 40 Technology Parkway South, Suite 300, Norcross Georgia 30092, USA. On information and belief, MONSANTO was the original producer of the Roundup product line and was the world's leading producer of glyphosate.

16.     MONSANTO was acquired by Bayer AG. on June 7, 2018.

## JURISDICTION AND VENUE

17.     Upon information and belief, Defendants worked as a single entity to manufacture, market, import, distribute and sell Roundup products, including the Roundup QuikPro herbicide product used by DAVIS, to residents of the State of Georgia.

18.     In 2018, Bayer AG completed a cash purchase of the Monsanto Company, assuming their liabilities as successors of interest.

19.     Monsanto entities currently hold no capital.

20.     Bayer currently holds a 100% interest in Monsanto Company.

21.     Bayer reported that Monsanto Company held no equity in its 2022 Subsidiaries and Affiliated Companies of Bayer Annual Report.

22.     Bayer reported that Monsanto Company had no income in its 2022 Subsidiaries and Affiliated Companies of Bayer Annual Report.

23.     Monsanto's equity and income has been consolidated into Bayer Corporation's financial statement.

24.     Monsanto channels its profits to Bayer Corporation.

25.     Monsanto channels its losses to Bayer Corporation.

26.     Bayer Corporation is the entity responsible for holding Monsanto Corporation's income and equity.

27.     Monsanto Corporation does not distribute dividends to shareholders.

28.    As a result, Bayer Corporation effectively serves as an alter-ego for Monsanto.

29.    Upon information and belief, Defendants operate as alter egos of the other to manufacture, market, import, distribute and sell Roundup QuikPro herbicide to residents of the State of Georgia.

30.    Upon information and belief, the Defendants have purposefully availed themselves of the privilege of doing business in the State of Georgia, invoking the benefits and protections in the jurisdiction through manufacturing, designing, labeling, marketing, distributing, supplying and/or selling the subject product and other herbicide products to users in Georgia.

31.    Defendants derived substantial revenue from goods and products used in Georgia.

32.    The Defendants knew, or reasonably should have known that, by placing such products into the stream of commerce in all or most U.S. states, such products would be utilized in said states.  The Defendants knew, or reasonably should have known, that they would likely be subject to the jurisdiction in Georgia.

33.    All Defendants advertise and sell goods, specifically Roundup, throughout the State of Georgia.  All Defendants are registered to conduct business in Georgia and have sufficient "minimum contacts" with the state, such that subjecting them to jurisdiction in Georgia does not offend traditional notions of fair play and substantial justice.

34.    "Roundup" refers to all formulations of Defendants' Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Hard Edger 1, Roundup Garden Foam Weed & Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, Roundup

Original 2k herbicide, Roundup Original II Herbicide, Roundup Pro Concentrate, Roundup Prodry Herbicide, Roundup Promax, Roundup Quik Stik Grass and Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to- Use Weed and Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer1 Ready-to-Use, Roundup WSD Water Soluble Dry Herbicide Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate, diquat and POEA, diquat and POEA.

35. DAVIS is a resident of the Commonwealth of Virginia. At all relevant times, DAVIS was exposed to and used Defendants' products in the State of Georgia.

36. DAVIS used Roundup which was purchased in the State of Georgia.

37. DAVIS suffered injuries as a result of his exposure to Roundup in the State of Georgia.

38. DAVIS was initially treated for his injuries as a result of his Roundup exposure in the State of Georgia.

## **FACTS**

39. At all relevant times, Defendants were in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or have acquired

and are responsible for Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed the commercial herbicide Roundup.

40.     During the years 2019 and 2020, DAVIS worked in landscaping and lawn maintenance as an employee of Master Sweeping and Maintenance, Inc., in Augusta, Georgia.

41.     Throughout his employment by Master Sweeping and Maintenance, DAVIS was tasked with spraying weeds with Roundup containing glyphosate, diquat and POEA, causing chronic exposure to Roundup containing glyphosate, diquat and POEA.

42.     On or about September 15, 2021, DAVIS began experiencing seizures which required emergency medical care.  DAVIS was diagnosed with acute kidney failure, renal failure, among other diagnoses associated with acute and chronic kidney and renal failure.  Following extensive work up, DAVIS was diagnosed with kidney failure caused by chronic exposure to Roundup containing glyphosate, diquat and POEA. After failed conservative care, including long term dialysis, DAVIS was placed on the kidney transplant list.

43.     As a direct and proximate cause of his exposure to Roundup, DAVIS underwent a kidney transplant in January 2023.  Based upon his early age, it is anticipated that DAVIS will need two more kidney transplants during his lifetime.

**Registration of Herbicides under Federal Law**

44.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA or "ACT"), 7 U.S.C. § 136 et seq.  FIFRA requires that all pesticides be registered with

the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, and use, except as described by the Act. 7 U.S.C. §136a(a).

45.     Because pesticides are toxic to plants, animals, and humans, at least to some degree, the EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §136a(c)(5)(D).

46.     FIFRA defines "unreasonable measurable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. §136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

47.     The EPA and the State of Georgia registered Roundup for distribution, sale, and manufacture in the United States and the State of Georgia.

48.     FIFRA generally requires that the registrant, MONSANTO in the case of Roundup, conduct the health and safety testing of pesticide products.

49.     The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests.

50.    The data produced by the registrant must be submitted to the EPA for review and evaluation.

51.    The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

52.    The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.

53.    The data necessary for registration of a pesticide has changed over time.

54.    The EPA is now in the process of re-evaluating all pesticide products through a Congressionally mandated process called "re-registration." 7 U.S.C. §136a-l.

55.    To reevaluate these pesticides, the EPA is demanding the completion of additional tests and the submission of data for the EPA's review and evaluation.

56.    In the case of glyphosate, and therefore Roundup, the EPA had planned on releasing its preliminary risk assessment - in relation to the reregistration process- no later than July 2015.

57.    The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

58.    In 2020, the EPA concluded that glyphosate was "not likely" to be a human carcinogen.

59.    Upon judicial review under FIFRA, the Ninth Circuit vacated the EPA's final human health risk assessment as unsupported by substantial evidence.

60.    The Court found that the EPA's conclusion improperly discounted epidemiological studies that showed an increased risk for non-Hodgkin's lymphoma.

61.    Additionally, among other reasons, the Court concluded that the EPA departed from its own guidelines for studying cancer risk by resolving all ambiguities in favor of a no-risk finding and improperly dealing with evidence of statistical significance.

62.    The Ninth Circuit's decision became final when the EPA declined to appeal to the Supreme Court.

63.    Shortly afterwards, the EPA withdrew its entire registration review process.

64.    As such, there is currently no valid EPA determination on the carcinogenicity of glyphosate.

**Scientific Fraud Underlying the Marketing and Sale of Glyphosate/Roundup**

65.    Glyphosate was first approved by the EPA in 1974.

66.    For Roundup to be registered, the EPA required that Monsanto submit pesticide toxicology studies demonstrating the toxicity or non-toxicity of Roundup at the time.

67.    Monsanto hired Industrial Bio-Test Laboratories ("IBT Labs") to conduct its required tests.

68.    IBT performed about 30 tests on glyphosate and glyphosate-containing products, including nine of the 15 residue studies needed to register Roundup.

69.    Paul Wright, a former Monsanto employee, was working at IBT Labs as a section manager of toxicology during the relevant time when Roundup testing was being conducted by IBT Labs.

70.    Monsanto submitted the results of two long-term rodent studies on glyphosate that were conducted by IBT to the EPA as part of glyphosate's registration.

71.    In 1972, Paul Wright departed from his role working in IBT Labs and returned to work at Monsanto's internal animal testing facility as a toxicologist.

72.   Paul Wright returned to his role at Monsanto in November 1972.

73.   In his role at Monsanto, he continued working on glyphosate and Roundup matters.

74.   In the late 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT Labs that revealed discrepancies between the new data and the final report relating to the toxicological impacts of glyphosate.

75.   Following the discrepancies found by the FDA, the EPA audited IBT and also found the toxicology studies conducted for Roundup were invalid.

76.   An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took speciments of the uterus from male rabbits."

77.   Paul Wright was indicted for fraud in 1981.

78.   Three top executives, including Paul Wright, were convicted of fraud in 1983.

79.   Monsanto paid Paul Wright's legal fees, which totaled 1.3 million dollars.

80.   As a result of its IBT Labs investigation, the EPA gave affected entities, including Monsanto, the option of either (1) submitting to continued EPA investigation or (2) submit a new test, untainted by IBT Labs.

81.   Monsanto chose to submit new glyphosate tests to the EPA.

82.   As a result, Monsanto had to redo both a mouse and rat study.

83.   In 1985, the EPA reviewed studies that linked glyphosate to cancer found in laboratory animals.

84.   Internal EPA memorandums indicate that the EPA made a preliminary classification on glyphosate as a Group C Oncogen.

85.    A Group C Oncogen under the EPA's classification means that a substance is
       possibly carcinogenic to humans.

86.    Monsanto met with the EPA following this classification and asked short of a new
       study or finding tumors in the control groups, what could Monsanto do to get the
       glyphosate classification off Group C.

87.    In response to these conversations with the EPA, Monsanto hired Dr. Marvin
       Kuschner, a pathologist, to review kidney slides from the redone study.

88.    Yet before Dr. Kushner even received the slides, Monsanto wrote to the EPA telling
       the EPA that Dr. Kushner's review of the kidney sections would persuade the agency
       that the observed tumors were not related to glyphosate.

89.    Dr. Kushner did not receive the slides until 11 days after Monsanto told the EPA what
       he would find.

90.    Monsanto subsequently submitted Dr. Kushner's report to the EPA that showed an
       additional tumor in the control group that was not previously there.

91.    Once the EPA reviewed the resectioned kidney slides, they found no additional
       tumors were present.

92.    In 1991, Monsanto persuaded the EPA to change its preliminary classification of
       glyphosate to Group E, meaning that there was evidence of non-carcinogenicity to
       humans.

93.    Upon the EPA's re-classification of glyphosate in 1991, the EPA made clear that its
       designation of glyphosate did not mean the chemical does not cause cancer: "It
       should be emphasized, however, that designation of an agent in Group E is based on
       available evidence at the time of evaluation and should not be interpreted as a

definitive conclusion that the agent will not be a carcinogen under any circumstances."

94. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup.

95. In that same year, the owner of Craven Laboratories and three of its employees were indicted, and later convicted, of fraudulent laboratory practices in the testing of pesticides and herbicides.

96. Despite the falsity of the tests that underlie its registration, within a few years of is launch, Monsanto was marketing Roundup in 115 countries.

### The Importance of Roundup to Monsanto's Market Dominance Profits

97. The success of Roundup was key to Monsanto's continued reputation and dominance in the marketplace.

98. Largely due to the success of Roundup sales, Monsanto's agriculture division was outperforming its chemical division's operating income, and that gap increased yearly.

99. But with its patent for glyphosate expiring in the United States in the year 2000, Monsanto needed a strategy to maintain its Roundup market dominance to ward off impending competition.

100. Monsanto began the development and sale of genetically engineered Roundup Ready seeds in 1996.

101. Since Roundup Ready crops are resistant to glyphosate, farmers can spray Roundup onto their fields during the growing season without harming the crop.

102. This allowed Monsanto to expand its market for Roundup even further.

103.   By 2000, Monsanto's biotechnology seeds were planted on more than 80 million acres worldwide and nearly 70% of American soybeans were planted from Roundup Ready seeds.

104.   It also secured Monsanto's dominant share of the glyphosate/Roundup market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of its Roundup herbicide.

105.   Through a three-pronged strategy of increased production, decreased prices, and coupling with Roundup Ready seeds, Roundup became Monsanto's most profitable product.

106.   In 2000, Roundup accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one, and accounting for close to half of Monsanto's revenue.

107.   Today, glyphosate remains one of the world's largest herbicides by sales volume.

108.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products.

109.   Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

110.   Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

   a.   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b.  And remember that Roundup is biodegradable and won't build up in the soil.
    That will give you the environmental confidence you need to use Roundup
    everywhere you've got a weed, brush, edging or trimming problem.

c.  Roundup biodegrades into naturally occurring elements.

d.  Remember that versatile Roundup herbicide stays where you put it. That means
    there's no washing or leaching to harm customers' shrubs or other desirable
    vegetation.

e.  This non-residual herbicide will not wash or leach in the soil. It ... stays where
    you apply it.

f.  You can apply Roundup with "confidence because it will stay where you put it." It
    bonds tightly to soil particles, preventing leaching. Then, soon after application,
    soil microorganisms biodegrade Roundup into natural products.

g.  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h.  Glyphosate's safety margin is much greater than required. It has over a 1,000-
    fold safety margin in food and over a 700-fold safety margin for workers who
    manufacture or use it.

i.  You can feel good about using herbicides by Monsanto. They carry a toxicity
    category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j.  "Roundup can be used where kids and pets will play and breaks down into natural
    material." This ad depicts a person with his head in the ground and a pet dog
    standing in an area which has been treated with Roundup.

111.  On November 19,1996, Monsanto entered into an Assurance of Discontinuance with
      NYAG, in which Monsanto agreed, among other things, "to cease and desist from

publishing or broadcasting and advertisements [in New York] that represent, directly or by implication" that:

a. Its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. Its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable.

c. Its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d. Its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e. Glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f. Its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

112. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

113. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

## Classifications and Assessments of Glyphosate

114.    The International Agency for Research on Cancer's (IARC) process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent.  Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

115.    Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

116.    In assessing an agent, the IARC Working Group reviews the following information: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and cancer bioassays; and (c) representative mechanistic data.

117.    The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

118.    For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015, to assess the carcinogenicity of certain herbicides, including glyphosate.

119.    On July 29, 2015, IARC issued a Monograph assessment for glyphosate, Monograph 112.

120.    IARC classified glyphosate as a 2A Probable Human Carcinogen.

121.    In making its probable human carcinogen classification, the Working Group considered "reports that have been published or accepted for publication in the openly

available scientific literature" as well as "data from governmental reports that are publicly available."

122.    The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

123.    Exposure pathways are identified as air (especially during spraying), water, and food.

124.    Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

125.    The assessment of the IARC Working group identified several case control studies of occupational exposure in the United States, Canada, and Sweden.  These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

126.    The IARC Working Group found that glyphosate caused DNA and chromosomal damage in human cells.

127.    One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

128.    In particular, the Working Group examined peer-reviewed studies which found that glyphosate caused DNA damage in the kidneys of mammals.

129.    In a 14-day feeding study in Wistar rats that were administered diets containing glyphosate, the rats' kidneys were discovered to retain the highest tissue concentrations of glyphosate when examined in comparison to glyphosate retained in the spleen, fat, or liver of mice (JMPR, 2006).

130. A follow-up 14-day feeding study in rats was conducted with the addition of a single oral dose of glyphosate. The study found that this repeated dosing of glyphosate did not alter the tissue distribution and that the rats' kidneys still retained the highest concentrations of glyphosate (JMPR, 2006).

131. The IARC Working Group also considered various other non-mammalian animal in vivo studies which found that glyphosate exposure caused kidney DNA damage in mice (Bolognesi et al. (1997), Peluso et al. (1998)).

132. Exposure to glyphosate has also been found to increase biomarkers for oxidative stress (Astiz et al., 2009b).

133. In male CD-I mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma.  A second study reported a positive trend for hemangiosarcoma in male mice.  Glyphosate increased pancreatic islet-calladenoma in male rats in two studies.  A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

134. The IARC Working Group noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate.  Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

135. Once Roundup and glyphosate-based formulations penetrate the skin, it concentrates into the tissues, eventually getting into the blood.

136. Roundup is excreted out of the blood by the kidneys and into the urine.

137. The IARC Working Group also noted that glyphosate has been detected in the urine

of agricultural workers, indicating absorption.  Soil microbes degrade glyphosate to

aminomethlyphosphoric acid (AMPA).  Blood AMPA detection after exposure

suggests intestinal microbial metabolism in humans.

138.    The EPA has a technical fact sheet, as part of its Drinking Water and Health, National

Primary Drinking Water Regulations publication, relating to glyphosate.  This

technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet

describes the release patterns for glyphosate as follows:

**Release Patterns**

Glyphosate is released to the environment in its use as an herbicide for controlling

woody and herbaceous weeds on forestry, right-of-way and cropped sites. These

sites may be around water and in wetlands. It may also be released to the

environment during its manufacture, formulation, transport, storage, and disposal.

139.    In 1995, the Northwest Coalition for Alternatives to Pesticides reported that

glyphosate was the third most commonly reported cause of pesticide illness among

agricultural workers in California, the state with the most comprehensive program for

reporting of pesticide-caused illness.

140.    Despite this, Defendants have never included a warning about potential kidney failure

on any Roundup product.

**Monsanto and Bayer's Knowledge of Roundup/Glyphosate's Damage to Kidneys**

141.    In addition to the published scientific literature, Bayer and Monsanto have been

aware of the damaging effects glyphosate exposure has on kidneys.

142.    Monsanto's Material Safety Data Sheet for Europe advises doctors to monitor

exposed individuals' kidney functions.

143.   Monsanto's Material Safety Data Sheet for Europe indicates that kidney failure results from its experience with human exposure to Roundup and glyphosate.

144.   In 2001, Dr. Daniel Goldstein, Director of Medical Toxicology at Monsanto, prepared a presentation that states that individuals who ingest Roundup concentrate should be monitored for renal function.

145.   In that same presentation, Dr. Goldstein reported that there is no utility for dialysis, except to treat kidney failure.

146.   Monsanto also reported that the toxicology of Roundup exposure indicates that renal injury is "usually mild, may be severe."

147.   Monsanto's OSHA Safety Data Sheet for its Roundup QuikPRO Herbicide product lists "causes damage to kidney" under its hazard statement.

148.   Despite these admissions, Monsanto and Bayer have and continue to publicly state that Roundup is safe and non-toxic to humans and consumers.

149.   Monsanto and Bayer have never included a warning that exposure to Roundup can cause kidney damage on its Roundup labels.

## **Recent Worldwide Bans on Roundup/Glyphosate**

150.   Several countries around the world have instituted bans on the sale of Roundup and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015.

151.   The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup which took effect by the end of 2015.

152.   In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in

abundance to private persons. In garden centers, Roundup is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

153. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

154. France banned the private sale of Roundup and glyphosate following the IARC assessment on glyphosate.

155. Bermuda banned both the private and commercial sale of glyphosate, including Roundup. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

156. The Sri Lankan government banned the private and commercial use of glyphosate, particularly out of concern that glyphosate has been linked to fatal kidney disease in agricultural workers.

157. The government of Columbia announced its ban on using Roundup and glyphosate to destroy illegal plantation of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

158. In Argentina, over 400 towns and cities have measures that restrict use of glyphosate.

159. In 2020, the Belgium Superior Health Council made the formal recommendation to ban glyphosate in Belgium.

160. In 2021, the Austrian legislature voted unanimously on a partial ban of glyphosate, banning use on sensitive areas and for private use.

161.    Germany's Federal Ministry of Food and Agriculture and Federal Ministry for the
        Environment, Nature, Conservation, and Nuclear Safety announced its intention of
        taking glyphosate off of the market by the end of 2023.

162.    The Gulf Coast Council, which is made up of 6 countries, have banned glyphosate as
        early as 2016.

163.    Portugal prohibits the use of glyphosate in all public spaces.

164.    In 2021, the President of the Portuguese Medical Association called for a worldwide
        ban on glyphosate, citing the findings contained in the IARC Monograph Vol. 112.

### Plaintiff's Exposure to Roundup

165.    During the years 2019 and 2020, DAVIS worked in landscaping and lawn
        maintenance as an employee of Master Sweeping and Maintenance, Inc., in Augusta,
        Georgia.

166.    Throughout his employment by Master Sweeping and Maintenance, DAVIS was
        tasked with spraying weeds with Roundup containing glyphosate, diquat and POEA,
        causing chronic exposure to Roundup containing glyphosate, diquat and POEA.

167.    Through his employment, DAVIS sprayed Roundup through a backpack sprayer that
        frequently spilled on his back and shoulders.

168.    On or about September 15, 2021, DAVIS began experiencing seizures which required
        emergency medical care.

169.    DAVIS presented in the ER with blue staining on his right ear and fingertips.

170.    DAVIS was diagnosed with acute kidney failure, renal failure, among other diagnoses
        associated with acute and chronic kidney and renal failure.  Following extensive work
        up, DAVIS was diagnosed with kidney failure caused by chronic exposure to

Roundup containing glyphosate, diquat and POEA.  After failed conservative care, including long term dialysis, DAVIS was placed on the kidney transplant list.

171.    As direct and proximate cause of his exposure to Roundup, DAVIS underwent a kidney transplant.  Based upon his early age, it is anticipated that DAVIS will need two more kidney transplants during his lifetime.

172.    As a result of exposure to Roundup, DAVIS incurred significant past medical expenses, will incur significant future medical expenses, and sustained permanent and debilitating injuries, significant past and future mental anguish, a loss of past earnings and future earning capacity, significant inconvenience, severe disfigurement, and significant past and future pain and suffering.

## CAUSES OF ACTION

### First Cause of Action - Strict Liability (Design Defect)

173.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 172 herein.

174.    DAVIS brings this strict liability claim against Defendants for defective design.

175.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including DAVIS, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of the Defendants. At all times relevant to this litigation, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised,

promoted, marketed, sold and distributed the Roundup products used by DAVIS as described above.

176.    At all times relevant to this litigation, the Defendants manufactured, designed and labeled Roundup in an unsafe, defective, and inherently dangerous manner which presented a danger to the public, and, in particular, DAVIS.

177.    At all times relevant to this litigation, Roundup reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia and throughout the United States, including DAVIS, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

178.    Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in design and formulation in that they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate when they left the hands of the Defendants' manufacturers and/or suppliers.

179.    Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that the foreseeable risks exceeded the alleged benefits associated with their design and formulation when they left the hands of Defendant's manufacturers and/or suppliers.

180.    At all times relevant to this action, Defendants knew or should have known that Roundup products were defective and were inherently dangerous and unsafe when used in the manner intended by Defendants.

181.    At all times relevant to this litigation, Roundup products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in design and formulation in one or more of the following ways:

a)    When placed in the stream of commerce, Roundup products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate.

b)    When placed in the stream of commerce, Roundup products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer, organ damage and other serious illnesses when used in a reasonably anticipated manner.

c)    When placed in the stream of commerce, Roundup products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d)    Defendants did not sufficiently test, investigate, or study Roundup products and, specifically, the active ingredients glyphosate and diquat in combination with POEA.

e)    Exposure to Roundup and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f)  Defendants knew or should have known at the time of marketing Roundup
    products that exposure to Roundup and specifically, presented an unreasonably
    high risk of development of cancer, organ damage and other severe illnesses and
    injuries.

g)  Defendants did not conduct adequate post-marketing surveillance and study of its
    Roundup products.

h)  Defendants should have employed safer alternative designs and formulations.

182.  At all times relevant to this litigation, DAVIS used and/or was exposed to the use of
      Roundup in an intended or reasonably foreseeable manner without knowledge of its
      dangerous characteristics.

183.  DAVIS could not have reasonably discovered the defects and risks associated with
      Roundup or glyphosate/diquat-containing products before or at the time of exposure.

184.  The harm caused by Defendants' Roundup products, in particular to DAVIS, far
      outweighed any benefit, rendering Defendants' products dangerous to an extent
      beyond that which an ordinary consumer would contemplate.  Defendants' Roundup
      products were and are more dangerous than alternative products, and Defendants
      could have designed Roundup products to make them less dangerous.

185.  At all times herein, the state of the industry's scientific knowledge was such that a
      less risky design or formulation was attainable than that used for Roundup.

186.  At the time Roundup products left Defendants' control, there was a practical,
      technically feasible and safer alternative design that would have prevented the harm
      to DAVIS without substantially impairing the reasonably anticipated or intended
      function of the herbicide.

187.  Defendants' defective design of its Roundup products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup products, including DAVIS.

188.  As a result of the unreasonably dangerous condition of the Roundup products, Defendants are strictly liable to DAVIS under Georgia law.

189.  The defects in Monsanto and Bayer Defendants' Roundup products were substantial and contributing factors in causing grave injuries to DAVIS, and, but for Defendants' misconduct and omissions, DAVIS would not have sustained his injuries.

190.  Defendants' conduct as described herein was reckless. Defendants risked the lives of consumers and users of its products, including DAVIS.  Defendants had knowledge of the safety issues associated with Roundup and glyphosate and diquat-containing products, but suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn, or inform the unsuspecting public.

191.  Defendants' reckless conduct warrants an award of punitive damages under Georgia law.

192.  As a direct and proximate result of placement of defective Roundup products into the stream of commerce, DAVIS incurred significant past medical expenses, will incur significant future medical expenses, and sustained permanent and debilitating injuries, significant past and future mental anguish, a loss of past earnings and future earning capacity, significant inconvenience, severe disfigurement, and significant past and future pain and suffering.

**Second Cause of Action- Strict Liability (Failure to Warn)**

193.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 192 herein.

194.    DAVIS brings this strict liability claim against Defendants for failure to warn.

195.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including DAVIS, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup and specifically, the active ingredients glyphosate and diquat.  These actions were under the ultimate control and supervision of Defendants.

196.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released Roundup products, and in the course of the same, directly advertised or marketed the products to consumers and end users, including the DAVIS, and therefore had a duty to warn of the risks associated with the use of Roundup and glyphosate/diquat containing products.

197.    At all times relevant to this litigation, Defendants had a duty to test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its Roundup products did not cause users and consumers to suffer from unreasonable and dangerous risks.  Defendants had a continuing duty to warn all users including DAVIS about the dangers associated with Roundup use and exposure.  Defendants,

as manufacturers, sellers, or distributors of chemical herbicides are held to the knowledge of an expert in the field.

198.   At the time of manufacturing, Defendants could have provided warnings or instructions regarding the full and complete risks associated with use and exposure to Roundup and glyphosate/diquat containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

199.   At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers and to those who would foreseeably use or be harmed by Roundup products, including DAVIS.

200.   Despite the fact that Defendants knew or should have known that Roundup posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure.  The dangerous propensities of Roundup products, as described above were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods at the time of distribution, supply, or sale, and were not known to end users or consumers such as DAVIS.

201.   Defendants knew or should have known that its products created significant risks of serious bodily harm to consumers as alleged herein, but Defendants failed to provide adequate warning of the risks of exposure to consumers and users.  Defendants wrongfully concealed information concerning the dangerous nature of Roundup and its active ingredients glyphosate and diquat, and further made false and/or misleading statements concerning the safety of Roundup and glyphosate.

202.    At all times relevant to this litigation, Defendants' Roundup products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Georgia, Virginia, and throughout the United States, including DAVIS, without substantial change in the condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

203.    DAVIS was exposed to Roundup products in the course of his employment doing regular lawn maintenance, without knowledge of the dangerous characteristics described herein.

204.    At all times relevant to this litigation, DAVIS used and/or was exposed to the use of Roundup products in their intended or reasonably foreseeable manner, without knowledge of their dangerous characteristics.

205.    DAVIS could not have reasonably discovered the defects and risks associated with Roundup or glyphosate/diquat containing products prior to or at the time of his exposure.  DAVIS relied upon the skill, superior knowledge, and judgment of the Defendants.

206.    Defendants knew or should have known that the minimal warnings disseminated with its Roundup products were inadequate, but failed to communicate adequate information about the dangers of use and exposure to Roundup, and failed to communicate appropriate and adequate warnings and instructions to render the products safe for their ordinary, intended, and reasonably foreseeable uses.

207.    Any information that Defendants provided or communicated failed to contain relevant warnings, hazards, and precautions that would have enabled landscaping workers such as DAVIS to utilize the products safely and with adequate protection.

Defendants disseminated inaccurate, false, and misleading information, which failed to communicate accurately or adequately the comparative safety, duration, and extent of the risk of injury associated with use of and/or exposure to Roundup and glyphosate/diquat; continued to promote the efficacy of its products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate and diquat.

208.    To this day, Defendants have failed to provide adequate and accurate warnings about the true risks associated with the use of and exposure to Roundup and its active ingredients glyphosate and diquat, including the development of cancer and organ failure.

209.    As a result of their inadequate warnings, Defendants' Roundup products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed by Defendants, and used by DAVIS.

210.    Defendants are liable to DAVIS for injuries caused by their negligent or willful failure, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of its products and the risks associated with the use of or exposure to Roundup and glyphosate/diquat.

211.    The defects in Defendants' Roundup products were substantial and contributing factors in causing injury to DAVIS, and but for Defendants' misconduct and omissions, DAVIS would not have sustained his injuries.

212.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with use and exposure to Roundup products, DAVIS could have avoided the risk of developing injuries as alleged herein and/or could have obtained alternative herbicides.

213.    As a direct and proximate result of the conduct of the Defendants described herein, DAVIS has suffered significant past medical expenses, will incur significant future medical expenses, and sustained permanent and debilitating injuries, significant past and future mental anguish, a loss of past earnings and future earning capacity, significant inconvenience, severe disfigurement, and significant past and future pain and suffering.

### Third Cause of Action - Negligence

214.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 213 herein.

215.    Defendants directly or indirectly, caused Roundup products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by DAVIS.

216.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of its Roundup products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

217.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Roundup products.  The duty of care owed to consumers and the general public included providing accurate, true,

and correct information concerning the risks of use and exposure to Roundup and to provide appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup, and, in particular, its active ingredients glyphosate and diquat.

218.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Roundup and specifically, the likelihood of severe organ damage as experienced by DAVIS.

219.    At all times herein Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Roundup products could cause or be associated with the injuries sustained by DAVIS and created a dangerous and unreasonable risk of injury to the users of these products, including DAVIS.

220.    Defendants also knew, or in the exercise of reasonable care, should have known, that users and consumers of Roundup were unaware of the risks or the magnitude of the risks associated with the use of and/or exposure to Roundup and glyphosate/diquat containing products.

221.    Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sales, and distribution of their Roundup products, in that Defendants manufactured and produced defective herbicides containing the chemicals glyphosate and diquat, which they knew or had reason to know of the inherent defects in the products, knew or had reason to know use or exposure to the products created a significant risk of harm and unreasonably

dangerous side effects, and failed to prevent or provide adequate warning of the potential risks and injuries.

222.   Despite their ability and means to investigate, study, and test Roundup products and to provide adequate warnings about the danger of use and exposure, the Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and/or exposure to Roundup and glyphosate.

223.   Defendants' negligence includes the following:

a.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup products without thorough and adequate pre- and post-market testing.

b.   Manufacturing, producing, promoting, formulating, creating, developing, designing, selling and/or distributing Roundup while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and consequently, the risk of serious harm associated with human use of and exposure to Roundup.

c.   Failing to undertake sufficient studies or conduct necessary tests to determine whether Roundup products and glyphosate/diquat containing products were safe for their intended use in landscaping, agriculture, and horticulture;

d.   Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup products so as to avoid the risk of serious harm associated with the prevalent use of Roundup as an herbicide;

e.   Failing to design and manufacture Roundup products so as to ensure they were at least as safe and effective as other herbicides on the market;

f.  Failing to provide adequate instructions, guidelines, and safety precautions to those persons who the Defendants reasonably know would use or be exposed to Roundup products.

g.  Failing to disclose to DAVIS, users/consumers, and the general public that use of and exposure to Roundup presented severe risks of cancer, organ failure, and other grave illnesses;

h.  Failing to warn DAVIS, consumers, and the general public that the risk of harm with exposure to Roundup was unreasonable, and that there were safer and effective alternative herbicides available to all consumers;

i.  Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup and glyphosate/diquat containing products;

j.  Representing that Roundup products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended purpose;

k.  Declining to make or propose any changes to labeling of Roundup or other promotional materials that would alert the consumers and the general public of the risks of Roundup and its ingredients;

l.  Advertising, marketing, and recommending the use of the Roundup products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Roundup and its ingredients;

     m.  Continuing to disseminate information to its consumers, indicating or implying

          that Roundup products present no danger to the public; and

     n.  Continuing to manufacture and sell Roundup products with the knowledge that

          they were unreasonably unsafe and dangerous.

224.    Defendants knew and/or should have known that consumers such as DAVIS would

      suffer injuries as a result of Defendants' failure to exercise ordinary care in the

      manufacturing, marketing, labeling, distribution, and sale of Roundup.

225.    DAVIS did not know the nature and extent of the injuries that could result from the

      intended use of and/or exposure to Roundup or its active ingredients.

226.    Defendants' negligence was the proximate cause of the injuries, harm, and economic

      losses suffered by DAVIS in the past and which he will continue to suffer in the

      future.

227.    Defendants' conduct as described herein was reckless. Defendants exposed

      consumers and users to Roundup products, including DAVIS, with full knowledge

      of risks associated with such use or exposure. Defendants have made a conscious

      decision not to redesign, re-label, warn, or inform the unsuspecting public, including

      DAVIS.  Such reckless conduct warrants an award of punitive damages.

228.    As a proximate result of Defendants' wrongful acts and omissions in placing its

      defective Roundup products into the stream of commerce without adequate warnings

      of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered

      significant past medical expenses, will incur significant future medical expenses, and

      sustained permanent and debilitating injuries, significant past and future mental

      anguish, a loss of past earnings and future earning capacity, significant

inconvenience, severe disfigurement, and significant past and future pain and suffering.

**Fourth Cause of Action – Breach of Express Warranties**

229.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 228 herein.

230.   At all times herein, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting its Roundup products, which are defective and unreasonably dangerous to consumers, including DAVIS, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

231.   At all times herein, Defendants expressly represented and warranted to the purchasers of Roundup products, by and through statements made in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Roundup products were safe to human health and the environment, and effective, fit, and proper for their intended use.  Defendants advertised, labeled, marketed, and promoted Roundup products, representing the quality in such a way to consumers and the public to induce their purchase or use, thereby making an express warranty that Roundup products would conform to all representations.

232.   These express representations included incomplete warnings and instructions that discuss, but fail to include the complete array of risks associated with use of and/or exposure to Roundup and glyphosate/diquat.  Defendants knew and/or should have known that the risks expressly included in Roundup warnings and labels did not

accurately or adequately identify the risk of developing the serious injury including but not limited to kidney/organ damage.  To the contrary, Defendants expressly represented that Roundup products were safe and effective for use by individuals such as DAVIS, and/or that they were safe and effective for use as agricultural and landscaping herbicides.

233.    The representations described herein contained or constituted affirmations of fact or promises made by the seller to the buyer, which became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

234.    Defendants placed Roundup products into the stream of commerce for sale and recommended their use to consumers and the public without adequate warning of the true risk of developing injury associated with the use of and exposure to Roundup and its active ingredients.

235.    Defendants breached these warranties because, among other things, Roundup products were defective, dangerous, unfit for use, did not contain label representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose.  Specifically, Defendants breached the warranties in the following ways:

    a.    Defendants represented through labeling, advertising, and marketing materials that Roundup products were safe.  Defendants fraudulently withheld and concealed information about the risk of serious injury associated with use of and/or exposure to Roundup and/or glyphosate/diquat by expressly limiting the

risks associated with the use and/or exposure included in warnings and labels; and

b. Defendants represented that Roundup products were safe for use and fraudulently concealed information that demonstrated that glyphosate/diquat, the active ingredients in Roundup, had carcinogenic properties and could cause kidney/organ damage, and further failed to disclose that Roundup was less safe than other products on the market.

236. The warranties and representations concerning the qualities of Roundup products as described herein, became a basis of the bargain for all purchases of Roundup products. Vertical privity is therefore not required.

237. DAVIS justifiably and detrimentally relied upon the express warranties and representations of Defendants while using Roundup products. In doing so, DAVIS reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of Roundup and glyphosate.

238. The Defendants had sole access to material facts concerning the nature of the risks associated with its Roundup products to be included in warnings and labels. The Defendants knew that consumers and users such as DAVIS did not have the ability to reasonably discover that the risks expressly included in Roundup warnings and labels were inadequate, inaccurate, and incomplete.

239. DAVIS had no knowledge of the falsity or incompleteness of the statements and representations concerning Roundup made by Defendants.

240. DAVIS used and/or was exposed to Roundup as researched, developed, designed, tested, formulated, manufactured, inspected, labeled, distributed, packaged,

marketed, promoted, sold, or otherwise released into the stream of commerce by Defendants.

241. Had the warnings and labels for Roundup products accurately and adequately identified the true risks associated with the use of said products, DAVIS could have avoided the injuries described herein.

242. As a proximate result of Defendants' wrongful acts and omissions in placing its defective Roundup products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered significant past medical expenses, will incur significant future medical expenses, and sustained permanent and debilitating injuries, significant past and future mental anguish, a loss of past earnings and future earning capacity, significant inconvenience, severe disfigurement, and significant past and future pain and suffering.

### Fifth Cause of Action- Breach of Implied Warranties

243. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 242 herein.

244. At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Roundup products, which are defective and unreasonably dangerous to consumers, including DAVIS, thereby placing Roundup products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

245.    Before DAVIS used and was exposed to Roundup products, Defendants impliedly warranted to its consumers - including DAVIS- that its Roundup products were of merchantable quality and safe for the use for which they were intended, including as herbicides for use in landscaping.

246.    Defendants failed to disclose that Roundup has dangerous propensities when used as intended and that the use of and/or exposure to Roundup and its ingredients carries an increased risk of developing severe injuries, including organ damage as sustained by DAVIS.

247.    DAVIS reasonably relied upon the skill, superior knowledge and judgment of Defendants, and upon the warranties that Roundup products were of merchantable and fit for their intended purpose or use.

248.    DAVIS, as an employee of the purchaser of Roundup products was at all relevant times in privity with Defendants.

249.    DAVIS is the intended third-party beneficiary of implied warranties made by Defendants to the purchasers of Roundup and is entitled to assert this claim.

250.    Defendants knew that Roundup products in question were expected to reach, and did in fact reach, consumers and users, including DAVIS, without substantial change in the condition in which they were manufactured and sold by Defendants.

251.    At all times herein, DAVIS was a foreseeable user of Roundup marketed by Defendants.

252.    Defendants intended that Roundup products be used in the manner in which DAVIS used them, and impliedly warranted each batch to be of merchantable quality, safe,

and fit for use, despite the fact that Roundup knew or should have known that use of or exposure to Roundup presented a risk of significant injury to the public.

253.    In reliance upon Defendants' implied warranty, DAVIS used Roundup as instructed and labeled and in the manner intended, recommended, promoted and marketed by Defendants.

254.    DAVIS could not have reasonably discovered or known of the risks of serious injury associated with Roundup or glyphosate.

255.    Defendants breached the implied warranty to DAVIS in that its Roundup products were not of merchantable quality, safe, or fit for their intended use, nor were they adequately tested, and in fact Roundup has dangerous propensities and can cause serious injuries, including organ failure.

256.    The harm caused by Defendants' Roundup products far outweighed any benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

257.    As a direct and proximate result of Defendants' wrongful acts and omissions, Plaintiff has suffered significant past medical expenses, will incur significant future medical expenses, and sustained permanent and debilitating injuries, significant past and future mental anguish, a loss of past earnings and future earning capacity, significant inconvenience, severe disfigurement, and significant past and future pain and suffering.

## DAMAGES

258.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in Paragraphs 1 through 257 herein.

259.    As a direct and proximate cause of the aforesaid acts and/or omissions by

Defendants, DAVIS suffered and will continue to suffer damages including, but not

limited to medical expenses, pain and suffering, disfigurement, loss of earning and

earning capacity, and severe and permanent injury.

260.    The facts as alleged herein entitled DAVIS to an award of punitive damages.

261.    Plaintiff is entitled to recover said damages.

## **PUNITIVE DAMAGES**

262.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation

contained in Paragraphs 1 through 261 herein.

263.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice.

Defendants were fully aware of the safety risks of Roundup.  Nonetheless,

Defendants deliberately crafted their label, marketing, and promotion to mislead the

public and the ultimate consumers.

264.    This was not done by accident or through some justifiable negligence.  Rather,

Defendants knew that they could turn a profit by convincing the agricultural and

landscaping industries that Roundup was harmless to humans, and that full

disclosure of the true risk of Roundup would limit the amount of money Defendants

would make selling Roundup.  Defendants' objective was accomplished not only

through its misleading labeling, but through a comprehensive scheme of selective

fraudulent research and testing, misleading advertising, and deceptive omissions as

more fully alleged herein.  DAVIS was denied the right to make an informed

decision about whether to purchase, use, or be exposed to an herbicide, knowing the

full risk of serious injury associated with use of and/or exposure to Roundup and/or

glyphosate/diquat.  Such conduct was done with conscious disregard the rights of the public, and specifically DAVIS.

265.    There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred.  Accordingly, DAVIS requests punitive damages against Defendants for the harms caused to him.

WHEREFORE, the undersigned Plaintiff, CHRISTIAN DAVIS, respectfully requests that the Court enter an award of damages to include the following:

(A)    Actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

(B)    Exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

(C)    Pre-judgment and post-judgment interest;

(D)    Costs including reasonable attorney's fees, court costs, and other litigation expenses as permitted by law; and

(E)    For any other and further relief as the Court deems just and proper.


Dated:  January 15, 2025                         Respectfully submitted,



                                            *C. Andrew Childers*
                                            C. Andrew Childers
                                            Georgia Bar No. 124398
                                            **Childers, Schlueter & Smith, LLC**
                                            1932 N. Druid Hills Road, Suite 100
                                            Atlanta, Georgia 30319
                                            Phone: (404) 419-9500
                                            Fax: (404) 419-9501
                                            achilders@cssfirm.com

Alexis Lilly (admitted *pro hac vice*)
Motley Rice LLC
28 Bridgeside Blvd
Mt. Pleasant, SC 29464
Phone: (843)-216-9483
alilly@motleyrice.com

*Attorneys for Plaintiff*